Commonwealth of Pennsylvania, Department of Transportation, Plaintiff *v.* Estate of Jesse W. Crea, Deceased, John Crea, Administrator, Defendant.

Argued June 13, 1977, before President Judge Bowman.

*Richard S. Herskovitz,* Assistant Attorney General, with him, *Robert W. Cunliffe,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for plaintiff.

*Philip D. Freedman, Caldwell, Clouser & Kearns,* for defendant.

Opinion by President Judge Bowman, August 16, 1977:

This action in trespass by the Department of Transportation (PennDOT) against the estate of Jesse W. Crea is one to recover damages resulting from the collapse of a bridge allegedly caused by decedent negligently driving his automobile against the

bridge superstructure. The decedent died in the accident.

After trial on waiver of jury trial, a verdict was entered in favor of PennDOT in the amount of $46,-500.00. Post trial motions for new trial and for judgment N.O.V. are presently before us for disposition after oral argument and submission of briefs.

Except for countervailing expert opinion testimony as to the condition of the bridge superstructure and the reason for its collapse, the record is that of witnesses for PennDOT and its exhibits. The accident out of which this litigation arose involved the collapse of a single span iron truss bridge, single lane, twelve feet in width, ninety-six feet in length, with an open grid roadway, spanning Wyalusing Creek along Legislative Route 316 in Susquehanna County. Originally erected in 1891, its maintenance became the responsibility of PennDOT in 1913. The approach to the bridge in the direction decedent was traveling is straight, narrowing in width as one approaches the bridge from a roadway width of approximately twenty-four feet to twelve feet eight inches at the bridge entrance. It is rather heavily used by local traffic. Decedent was known to have frequently used it.

For many hours prior to the accident, decedent and others were playing cards and consuming alcoholic beverages at a tavern approximately one mile from the bridge. Between 12:30 a.m. and 1:00 a.m. on the morning of April 9, 1973, decedent and a friend left the tavern, entered their respective automobiles and departed for their homes, traveling a common route to the bridge with the friend preceding decedent. The friend crossed the bridge some thirty to forty yards ahead of decedent who was observed through a rear vision mirror approaching the bridge, but the friend did not observe decedent's car enter

upon the bridge as he turned out of sight after crossing the bridge. The friend first became aware of the accident later that day. Within two hours after the friend had crossed the bridge, it was found collapsed and the Crea vehicle was found upside down in the creek, inside of which was the body of decedent. A deputy coroner declared him dead at 2:30 a.m., and a blood sample was taken which disclosed a .265 percent alcohol content. On the morning in question, the roadway of the approach to the bridge was in good condition and dry; the weather was cool but fair.

A PennDOT accident investigation expert, after having examined the decedent's vehicle and the scene of the accident, including skid marks identified as having been made by the decedent's vehicle, determined that the left front of the vehicle struck the left front end post of the bridge superstructure with an impact described on cross-examination as modest. A PennDOT engineer who qualified as an expert, after examination of the collapsed bridge superstructure, its substructure and having had a test made of the tensile strength of the end post, opined that the vehicle's impact against the end post caused the bridge superstructure to collapse. He was of the opinion that the directional thrust of the impact upon the end post caused it to become disengaged from its underpinning, thereby producing a twisting stress upon the components of the superstructure causing them to collapse by their weight into the creek.

This witness and another for PennDOT testified that the bridge met minimum strength requirements, was an acceptable structure according to standards in the bridge industry and was adequate for its intended purpose of carrying approximately 400 vehicles a day with a four-ton load limit. Periodic inspections of the bridge supported by written reports and more fre-

quent visual inspections disclosed the structural truss members of the bridge to be in good condition with no signs of overstress. The last inspection with a written report was made in July 1971. In that report, the masonry foundation was indicated to be in poor condition, but there is no evidence that the condition of the foundation in any way contributed to the collapse of the superstructure. On cross-examination it was acknowledged that as designed and maintained, this bridge was not "accident proof" and that based upon advancements in bridge engineering, design and materials suitable for construction of bridges, a bridge such as the one in question would not be designed today. Defendant's expert testified that the bridge as designed and erected would not meet today's standards for bridge construction and that regardless of the cause of the collapse of its superstructure, it was inadequate to serve its intended purpose.

Defendant's motion for judgment N.O.V. asserts that (1) plaintiff has failed to prove defendant's negligence as a matter of law (2) that PennDOT is guilty of contributory negligence as a matter of law in failing to protect it against the results of the collision as here occurred and (3) PennDOT is not entitled to recover damages for want of proof thereof by a proper measure of damages. Defendant's motion for a new trial is directed to trial rulings in allowing a postmortem blood test of decedent to be admitted into evidence in permitting expert opinion testimony to be admitted as violative of the "dead man's rule", and in admitting into evidence testimony concerning the results of a test upon the end post of the bridge for want of adequate identification of the tested end post as being the one with which decedent's vehicle collided.

Defendant's asserted reasons for a new trial are without merit. The evidence discloses that for a sub-

stantial period of time shortly before the accident decedent was consuming alcoholic beverages. The blood test was properly admitted to reasonably establish a degree of intoxication sufficient to prove decedent's unfitness to drive a vehicle, an essential element on the issue of decedent's negligence in driving his vehicle into the left end post of the bridge superstructure. *Morreale v. Prince,* 436 Pa. 51, 258 A.2d 508 (1969); Section 624.1, The Vehicle Code, Act of April 29, 1959, P.L. 58, *as amended,* added by Act of July 28, 1961, P.L. 918, *as amended, formerly* 75 P.S. §624.1, repealed by Act of June 17, 1976, P.L. 162, effective July 1, 1977.

Defendant cites no authority for the novel interpretation of the "dead man's rule", Act of May 23, 1887, P.L. 158, *as amended,* 28 P.S. §322, that PennDOT's expert witnesses, as employees of PennDOT in high supervisory positions, have interest adverse to the decedent. For an interest to be adverse, it must be one from which the witness will either gain or lose as the direct legal operation and effect of a judgment rendered. *Gelb Estate,* 425 Pa. 117, 228 A.2d 367 (1967). Regardless of their positions with PennDOT, these witnesses have absolutely nothing to gain or lose from the outcome of this case. *See also Oliver v. Safe Deposit & Title Guaranty Co.,* 315 Pa. 552, 173 A. 281 (1934).

Equally without merit is defendant's objection to the testimony relating to the test result of a component of the bridge superstructure. CX-12 introduced without objection is adequate foundation for such testimony, as it identifies the tested object as the left end post of the bridge superstructure.

Turning to defendant's assigned reasons for judgment N.O.V., it is not seriously contended that the evidence is insufficient for a fact finder to have con-

cluded that the decedent was guilty of negligence in operating his vehicle in such a manner as to cause it to collide with the left end post of the bridge superstructure, and we are equally convinced that, as a matter of law, the evidence allows for such a result.

Nor, as a matter of law, is PennDOT guilty of contributory negligence in maintaining the bridge as it was constructed and maintained at the time of the accident. Given the evidence that it was the direction of the thrust of the force of the collision of decedent's vehicle with the left end post of the bridge superstructure that caused its collapse, we cannot say that Penn-DOT has a duty to construct and maintain highway bridges that would make it virtually an insurer against all accidents that may produce a collapse no matter how unforeseeable a particular accident might be in producing such a result. Reasonable minds might differ as to the duty of care to be visited upon PennDOT in constructing and maintaining bridges reasonably safe to the traveling public, but it cannot be held to a degree of care which would foresee all possible—and improbable—events that may arise out of the collision of a negligently driven vehicle with a bridge superstructure.

*Bowles v. Pittsburgh*, 343 Pa. 39, 20 A.2d 783 (1941) and *Shipley v. Pittsburgh*, 321 Pa. 494, 184 A. 671 (1936), cited by defendant, are inapposite, as in both cases notice of a defect in a bridge structure was present. Such is not the case here.

A novel, if not unique, issue of the proper measure of damages is raised by the singular facts of this case. The evidence discloses that the bridge was not repairable or restorable to its condition prior to the accident because of the irreparable damage sustained by the component parts of the superstructure incident to its collapse and because the cost of fabricating and

erecting a new superstructure of the same material and design would exceed the cost of erecting a new bridge. A new bridge was, therefore, erected at the same location, which incorporated into it the steel grid roadway of the former bridge which had been salvaged after the accident. Of different design, the new bridge is a steel multistringer two-span bridge of the same width as the former bridge but designed to carry lawful maximum weight loads and which has incorporated into its design safety features to protect it against forces other than load and dead weight forces; *i.e.*, protection against other forces such as caused the former bridge to collapse. The end result was to replace an eighty year old bridge of limited load capacity, but with a modern steel grid road surface, and one which, despite its age, continued to fill its intended purposes with a new bridge of modern design with maximum load capacity and with safety features against forces other than load and dead weight not found in the former structure.

To provide for a new bridge based upon its design and specifications, PennDOT invited public bids and thereafter awarded a contract in an amount not to exceed $86,428.81. The actual cost was approximately $80,000.00. It was testified that the item and unit price bids of the contract were fair and reasonable in the industry. With this evidentiary foundation, PennDOT offered in evidence an exhibit (CX-17) supported by testmony of its witness, that items of the construction contract attributable to damage inflicted upon the former bridge structure by reason of the accident in question less improvements made to the substructure (an abutment) totaled $46,584.17. The exhibit and supporting testimony were offered to support PennDOT's theory that the cost of replacement with certain adjustments not questioned by defendant,

is the proper measure of damages under circumstances where a bridge adequate for its intended purposes and not contemplated for improvement or replacement, is destroyed. It cites *Commonwealth v. Hygrade Products Co., Inc.,* 46 Pa. D. & C. 450 (1942), as supporting its position. Defendant objected to the exhibit, asserting that it was not representative of the proper measure of damages to be applied. Citing *Romesberg v. Caplan Iron and Steel Co.,* 385 Pa. 36, 122 A.2d 53 (1956), defendant contends that the proper measure of damages is the cost of repair if enough is left to justify repair at a cost not exceeding its value immediately prior to injury; otherwise, it is actual value before harm considering its age, condition and other circumstances affecting it, less salvage. Defendant contends that the PennDOT exhibit meets neither test. As the uncontested evidence in this case is that the former bridge superstructure was not restorable or repairable, we take defendant's position to be that the only proper measure of damages would be the actual value of the former superstructure before the accident, taking into consideration its age, condition and other circumstances affecting it, less salvage. As so measured, this record is wholly devoid of proof of damages by PennDOT.

The fundamental purpose of damages for an injury to or destruction of property by the tortious conduct of another is to compensate the injured party for the actual loss suffered. *Peters v. Stroudsburg Trust Co.,* 348 Pa. 451, 35 A.2d 341 (1944). Although clear in its purpose, proof of damages and the measure to be applied in proof of damages has long troubled the courts and writers, particularly in cases in which value as measured in the market place is wanting, or the application of market place values is unlikely to compensate the injured party for the loss suffered.

Recognizing that damages as compensation for actual loss generally involve some uncertainty and contingencies, reasonable certainty as distinguished from mere conjecture has been established as the criteria of proof thereof. *Wilcox v. Regester,* 417 Pa. 475, 207 A.2d 817 (1965); *Rothrauff v. Sinking Spring Water Co.,* 339 Pa. 129, 14 A.2d 87 (1940).

As applied to buildings and other structures, generally it is said that the amount of recovery for injury to or destruction is the amount of the loss, *i.e.,* the actual damage done to the property. Where the injury is permanent, the measure of damages is the reduced market value of the property. If the injury is not of a permanent character but is repairable, the measure of damages is the cost of restoring the property to its former condition unless cost of restoration should equal or exceed the actual value of the property, in which case the measure of damages would be the actual value immediately before the injury, taking into consideration its age, condition and any other circumstances affecting it. *Romesberg v. Caplan Iron and Steel Co., supra,* (sand crusher practically destroyed under mistaken belief that tort-feasor owned the property); *Jones v. Monroe Electric Co.,* 350 Pa. 539, 39 A.2d 569 (1944), (total destruction of barn set afire by a negligent act).

However, as value in the commercial sense is determined by the market demand for the thing valued, *Sechrist v. Bowman,* 307 Pa. 301, 161 A. 332 (1932), the application of such a damage formula to property in the public domain, such as a bridge forming a part of a highway system, cannot possibly fulfill its purpose of compensating the injured party for the actual loss sustained. The "value" of such a bridge regardless of its age, condition and other circumstances cannot possibly be determined for want of any such value

in the market place. Any attempt to so value it would be wholly speculative, the very pitfall to be avoided in proof of damages.

Our research has disclosed only two decisions directed to the issue of the proper measure of damages incident to the negligent destruction of a public bridge. *Commonwealth v. Hygrade Products Co., Inc., supra,* cited by PennDOT, is a strikingly similar case distinguishable only in that the State there sought to recover damages measured by the cost of a temporary replacement for a collapsed bridge. It said:

> We find in 25 C.J.S. 610 the following statement: 'Where a structure appropriate to a particular use and sufficient therefor has been destroyed, the measure of damages may be the cost of replacing it, without taking into consideration the difference in value between the old and a new structure of the kind involved.' Also J. W. Paxson Co. v. Board of Chosen Freeholders of Cumberland County, 201 Fed. 656. The measure of damages here allowed seems to fall within the rule as stated in the quotation, if it be understood that a replacement may be a temporary as well as a permanent one.

46 Pa. D. & C. at 455.

The same measure of damages was applied in *J. W. Paxson Co. v. Board of Chosen Freeholders of Cumberland County,* 201 F. 656 (3d Cir. 1912), in which the Third Circuit Court of Appeals affirmed the district court in a case involving the virtual destruction of a drawbridge in a navigational accident. It said:

> The plaintiff was compelled, by the negligence of the defendant, to build a new structure, which, as a new structure, was possibly, though not certainly, more valuable than the old one.

But the old structure sufficed for the purposes of the plaintiff, and the plaintiff was damaged by being compelled to procure a new structure in place of the old one, for the contract price of which it was obliged to pay. The sufferer by the negligence of the defendant cannot be compelled to perform the impossible task of re-creating the old span, without buying a new one, or make a nice computation of the difference in value between the old one and the new. The plaintiff did not need a new span. The old one was sufficient, and the county was damaged by being compelled to incur the cost of a new one.

201 F. at 663.

While we consider the measure of damages as announced in these two cases as too broadly stated for general application, it is our opinion that they do represent the proper measure of damages under their facts and the facts of this case. Where concepts of value in a commercial sense cannot be applied because a particular structure in the public domain simply doesn't have any such value, speculatively or otherwise, the measure of damages must be the reasonable cost of replacement by a similar structure consistent with current standards of design. Anything less would not compensate the owner for the actual loss.

The evidence here discloses that PennDOT's action was consistent with this measure of damages and that its claim for damages (CX-17), not otherwise objected to, is a reasonable calculation of such a measure of damages, taking into consideration and deducting the cost of a new abutment not directly related to the accident and salvaging the iron grid roadway of the former bridge and having it incorporated into the new bridge structure.

Defendant's motions for a new trial and for judgment N.O.V. are hereby denied.

## Order

Now, August 16, 1977, unless defendant shall file exceptions within thirty (30) days of the date hereof, judgment on the verdict is hereby entered in favor of Pennsylvania Department of Transportation and against the Estate of Jesse W. Crea, Deceased, John Crea, Administrator, in the amount of $46,500.00.